**GENERAL MOTORS ACCEPTANCE COR-PORATION v. NUSS, (GENERAL FI-NANCE CO. OF LOUISIANA, Inc., In-tervenor).**

No. 17255.

Court of Appeal of Louisiana. Orleans.

Nov. 27, 1939.

Rehearing Denied Jan. 9, 1940.

Writ of Certiorari Granted March 4, 1940.

Prowell & McBride, of New Orleans, for appellant and intervenor.

Henry J. Voss and William Donnaud, both of New Orleans, for appellant Geo. L. Nuss.

O'Niell & O'Niell, of New Orleans, for appellee.

WESTERFIELD, Judge.

The General Motors Acceptance Corporation of the State of New York brought this suit against George L. Nuss, alleging that he was in possession of a certain 1937 model Chevrolet sedan, bearing motor number 634242 and serial number 3GAO4-42986, on which it holds a chattel mortgage dated April 15, 1937, securing an unpaid balance of $375.20, with 8 per cent. interest from February 15, 1938, and 10 per cent. attorney's fees; that it acquired its mortgage for a valuable consideration from the Buford Chevrolet Company, a Chevrolet dealer in Fredericktown, Madison County, Missouri, who had sold the automobile to one Charles R. Caldwell, also a resident of Fredericktown, and who had given the mortgage to the Buford Chevrolet Company to secure an unpaid portion of the purchase price; that because of the failure of Caldwell to pay several installments (the deferred portion of the purchase price was to be paid in installments), the entire outstanding balance, under the terms

of the agreement of sale, became due; that the automobile was removed from the State of Missouri and brought to New Orleans without the knowledge or consent of plaintiff; that the chattel mortgage of plaintiff was "executed, filed and recorded in full compliance with the Missouri law * * * and that under Missouri law a chattel mortgage on property subsequently removed from the state where the mortgage was executed is effective against third persons notwithstanding it is not recorded in the state to which it is removed".

It is alleged that George L. Nuss, who has possession of the automobile, can remove, part with, or dispose of it, which plaintiff fears he will do. Consequently it asks that a writ of sequestration issue and that the automobile be seized and sold and the proceeds applied to the satisfaction of plaintiff's chattel mortgage. The automobile was seized and the sequestration bonded by Nuss. The General Finance Company of Louisiana, Inc., a Louisiana corporation, intervened and united with the defendant in resisting plaintiff's claim, asserting that the purported chattel mortgage declared upon was not valid in the State of Louisiana as against the rights of innocent third persons, particularly intervenor, for the reason that it was never recorded in this State in accordance with the laws of Louisiana and neither intervenor nor the defendant, Nuss, had any knowledge of the existence of the chattel mortgage; that intervenor is the holder of a certain promissory note issued by George L. Nuss, dated April 2, 1938, and payable to the order of bearer for the sum of $441, payable in eighteen monthly installments at $24.50 each; that the note was secured by an act of mortgage passed by Richard T. McBride, notary public, of even date, bearing upon the same Chevrolet car seized by plaintiff under its writ of sequestration; that Nuss has paid $245 on the principal of the mortgage note and that there is still due $196; that the note was given in part payment of the purchase price of the automobile to the Globe Used Car Lot in this City, from which organization Nuss purchased the automobile; that intervenor has both a chattel mortgage and a vendor's lien, duly recorded. The intervenor's petition concludes with the usual prayer for the recognition of prior lien.

On the trial of the case a stipulation of fact was entered into by all parties, wherein it was admitted that the General Motors Acceptance Corporation of New York, as well as the General Finance Company of Louisiana, Inc., were both in good faith and that the Missouri chattel mortgage relied upon by the former corporation was in all respects good and valid under the laws of Missouri, and the mortgage of the General Finance Company of Louisiana, Inc., was in all respects valid under the laws of Louisiana and acquired by the General Finance Company, Inc., without knowledge of the pre-existing mortgage or lien held by the General Motors Acceptance Corporation. It was further stipulated that George L. Nuss, the defendant, had purchased the automobile from the Globe Used Car Lot in good faith and without knowledge of any lien or equity resulting from any mortgage in favor of anyone.

There was judgment below in favor of plaintiff, the General Motors Acceptance Corporation, recognizing the validity of its Missouri mortgage and ordering the sequestered automobile sold and the proceeds applied first to the payment of plaintiff's claim and thereafter to the satisfaction of intervenor's claim, should there remain any residue. Defendant, Nuss, and intervenor, have both appealed to this Court.

Counsel for plaintiff assert that the overwhelming weight of authority supports the decision of the trial court. The following quotation from an Arizona case is typical of many others cited.

"Chattel mortgage, recorded in state where executed, and there conveying constructive notice, continues to have same effect when property is removed, into another state.

"General rule is mortgagee's interest in chattel mortgage is recognized in state to which it is removed, whether recorded there or not. * * *

"Mortgagee, under mortgage recorded in foreign state in county where property was situated at time, was entitled to property as against subsequent assignee; mortgagee having priority in foreign state." Davis v. Standard Accident Insurance Company, 35 Ariz. 392, 278 P. 384.

Other states in which this same rule is recognized are said to be Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Idaho, Illinois, Iowa, Kentucky, Minnesota, Missouri, Nebraska, New Mexico, New York, North Dakota, Oklahoma, Tennessee, West Virginia and Wyoming.

Counsel also cite Restatement of the Law—Conflict of Laws, § 268, page 354; Jones on Chattel Mortgages and Conditional Sales (Bowers Ed.) Volume 1, Sec. 299, page 479; 11 Corpus Juris, page 424; Huddy's Encyclopedia of Automobile Law (Ninth Ed.) Vol. 11, page 32; Blashfield's Cyclopedia of Automobile Law and Practice, Volume 7, Permanent Edition, page 327. The authorities are very numerous and respectable, but all of them are from our sister states in which the common law prevails. We might add, however, that all of the common law authorities are not in agreement with what appears to be the great majority, for Michigan, Pennsylvania and Texas constitute a formidable minority. Allison v. Teeters, 176 Mich. 216, 142 N.W. 340; Vining v. Miller, 116 Mich. 144, 74 N.W. 459; Corbett v. Littlefield, 84 Mich. 30, 47 N.W. 581, 11 L. R.A. 95, 22 Am.St.Rep. 681; Boydson v. Goodrich, 49 Mich. 65, 12 N.W. 913; Montgomery v. Wight, 8 Mich. 143; State Bank of Sherman v. Carr, 15 Pa.Super. 346; Armitage v. Spahn, 4 Pa.Dist.R. 270; MacCabe v. Blymyre, 9 Phila., Pa., 615; McKaig v. Jones, 3 Pa.L.J. 365, 2 Clark 123; Crosby v. Huston, 1 Tex. 203; Best v. Farmers', etc., Bank, Tex.Civ.App., 141 S. W. 334. To quote briefly from one of the Michigan cases:

"It would be unreasonable to require a citizen of Michigan to take notice of the files and entries in Nebraska." Corbett v. Littlefield, supra [84 Mich. 30, 47 N.W. 582, 11 L.R.A. 95, 22 Am.St.Rep. 681].

Until 1912, when the first of a number of chattel mortgage acts were adopted, Louisiana did not recognize chattel mortgages. Prior to that time only such objects as were mentioned in Articles 3283 and 3289 of the Revised Civil Code of 1870 were subject to mortgages. These articles read as follows:

3283. "The mortgage only takes place in such instances as are authorized by law."

3289. "The following objects alone are susceptible of mortgage:

"1. Immovables subject to alienation, and their accessories considered likewise as immovables.

"2. The usufruct of the same description of property with its accessories, during the time of its duration.

"3. Ships and other vessels."

Under Article 461 of the Civil Code of 1825, slaves were considered as immovables by operation of law and mortgages on slaves were recognized subject to the same rules as mortgages on real estate. In 1829, in the case of Miles v. Oden, 8 Mart., N.S., 214, 19 Am.Dec. 177, a group of slaves which had been mortgaged in Kentucky, where they were located at the time of the execution of the mortgage, were removed to Louisiana, where they were sold to an innocent purchaser. The Kentucky mortgage had not been recorded in Louisiana and the court refused to recognize it to the prejudice of the innocent purchaser of the slaves, saying:

"On the first ground, we are of opinion, that the lien, which the plaintiffs might have had in Kentucky, cannot affect a bona fide purchaser in this state. The court are aware of the common principle, that contracts are governed by the laws of the country in which they are passed; and that, by the comity of nations the rights, flowing from them, are not diminished by the parties passing into other states:—Provided, the laws of that state afford adequate remedies to enforce the obligation. But this principle is subject to the exception, that in carrying them into effect, no injury result to the inhabitants of the country whose aid is required to enforce them. * * *

"Our legislature have declared, that liens on land and slaves remaining in the possession of the owner, should not have effect against third persons, unless duly recorded. This rule was doubtless established to avoid the inconvenience and injury which parties, buying without notice of these liens, would sustain. Every reason, which supposes the necessity of such a regulation, as between our own citizens, applies with equal, if not greater force, to the inhabitants of another country, who come here to enforce liens given by the laws of the place, whence the property is brought.

"Huberus, whose authority on this subject is justly entitled to great attention, after giving the limitation above noticed to the general rule, presents nearly this case as an example of it; and states that a mortgage, good on personal property in one country, cannot be carried into effect in another state, whose laws do not recognize such hypothecations. If this be true, where mortgages of this description are not recognized as having any legal effect, we think the same rule should apply where they are only permitted against

third persons, on certain conditions—such as registry, &c."

In 1832, in Hopkins v. Lacouture, 4 La. 64, the court considered a slave mortgage executed in Alabama and held that "this mortgage was not recorded in Louisiana, and cannot affect a purchaser in this state, who may have acquired a title from Malone, by whom this deed of trust was created."

In 1833, in the case of Ohio Insurance Company v. Edmondson, 5 La. 295, the court declined to give effect to an Ohio lien on a steamboat executed in Ohio, saying:

"The admission of a mortgage from another state, cannot be understood by us, to place the foreign creditor in a better situation than the domestic one; for the doctrine of giving effect to liens and laws from another state, must be always understood as subject to the condition, that the admission of them does not work an injury to the citizen of the state. We should act on these principles, if the transaction had taken place in this state."

And again, in 1841, in Zollikoffer v. Briggs, Lacoste & Co., 19 La. 521, a Mississippi slave mortgage was considered and the court said:

"With respect to the slave Manuel, the plaintiff does not allege in his petition that he is the owner, but only that he has a lien or mortgage by deed of trust executed in Mississippi. It is not shown, nor even alleged that the evidence of this lien has ever been recorded in this State. Without such registry we have uniformly held, it cannot have effect in this State, against creditors."

In 1849, in Tillman v. Drake, 4 La.Ann. 16, a Tennessee slave mortgage was considered and it was held that "in order to produce effect as a mortgage against third persons, notice is indispensable. The deed under which the plaintiff claims was never recorded in this State."

Counsel for plaintiff contends that the slave cases are not analogous because, under the Louisiana law then obtaining, a slave, immediately upon his introduction into this State, became an immovable and was, consequently, subject to the laws of Louisiana relating to immovables, the elementary principle of which was that a mortgage upon real estate, to be effective against third persons, must be recorded at the situs of the realty.

"It has been repeatedly decided, that a mortgage of slaves, executed out of this State, will not attach to the slaves when brought here, except from the time that it is duly registered here. When slaves are brought into this State, they become immovables by our law; and, of course, are subject from that time to all our laws concerning immovables. Verdier v. Leprete, 4 La. [41], 43. Hopkins v. Lacouture, 4 La. [64], 65. Copley v. Sanford, Executor, 2 La.Ann. 335 (46 Am.Dec. 548)." Frelson v. Tiner & Conrey, 6 La.Ann. 18.

It must be admitted that there is a distinction to be made with respect to mortgages upon movable and immovable property, but, nevertheless, the question of comity, upon which plaintiff's case is largely based, is involved in the slave cases as well as in cases involving chattel mortgages upon slaves and mortgages upon other movables.

In Delop v. Windsor et al., 26 La.Ann. 185, decided in 1874, when chattel mortgages were not recognized in Louisiana, the court held that considerations of comity did not require the recognition of chattel mortgages valid in other states but unknown to our law.

In Hughes, Hyllested & Co. v. Klingender Brothers, 1859, 14 La.Ann. 845, the Bank of Liverpool claimed the legal title to a ship "as vendee and trustee". The instrument which formed the basis of the bank's title to the ship (the usual form of common law mortgage) was considered as having "no analogy to any mode known to our law of affecting personal property for the security of debts. It purports to sell to one man, to protect the rights of a third person, and yet the vendor is to retain possession. The contract is not a sale, nor a pledge; for there is no delivery, which our law deems essential in order to perfect either contract as to third persons. As our law would not enforce a similar contract between our own citizens, if made here, it will not enforce it to defeat rights already acquired by the attachment under our own laws." At another point in the opinion the court said that:

"The comity of nations extends only to enforce obligations, contracts and rights, under those provisions of law of other countries which are analogous or similar to those of the State where the litigation arises."

In Story on Conflict of Laws, Chapter 2, paragraph 33, page 32, we read:

"It has been thought by some jurists that the term 'comity' is not sufficiently expressive of the obligation of nations to give effect to foreign laws when they are not prejudicial to their own rights and interests. And it has been suggested that the doctrine rests on a deeper foundation; that it is not so much a matter of comity of courtesy as a matter of paramount moral duty. Now assuming that such a moral duty does exist, it is clearly one of imperfect obligation, like that of beneficience, humanity, and charity. Every nation must be the final judge for itself not only of the nature and extent of the duty, but of the occasions on which its exercise may be justly demanded. And certainly there can be no pretense to say that any foreign nation has a right to require the full recognition and execution of its own laws in other territories, when those laws are deemed oppressive or injurious to the rights or interests of the inhabitants of the latter, or when their moral character is questionable, or their provisions are impolitic or unjust. Even in other cases it is difficult to perceive a clear foundation in morals or in natural law for declaring that any nation has a right (all others being equal in sovereignty) to insist that its own positive laws shall be of superior obligation in a foreign realm to the domestic laws of the latter of an equally positive character. What intrinsic right has one nation to declare that no contract shall be binding which is made by any of its subjects in a foreign country, unless they are twenty-five years of age, any more than another nation where the contract is made has a right to declare that such a contract shall be binding if made by any person of twenty-one years of age? One would suppose that if there be anything clearly within the scope of national sovereignty, it is the right to fix what shall be the rule to govern contracts made within its own territories."

Conditional sales are not recognized in Louisiana. Nevertheless our courts have uniformly held that where such agreements have been entered into in another state whose laws recognize their validity, and the chattel is brought into this state, the contract is enforcible here by the vendor. Barber Asphalt Paving Company v. St. Louis Cypress Company, 121 La. 152, 46 So. 193; Overland Texarkana Company v. Bickley, 152 La. 622, 94 So. 138; Securities Sales Company v. Blackwell, 167 La. 667, 120 So. 45; Hinton Company v. Rouse, 4 La.App. 471; Baldwin Piano Company v. Thompson, 8 La.App. 212; Gumpert v. Philip Worlein, 149 La. 840, 90 So. 215. These cases are pointed to with confidence by counsel for plaintiff as indicating that our courts have extended the doctrine of comity to a point much further than it is necessary to go in order to sustain the proposition advanced by plaintiff concerning the effect of the Missouri mortgage in Louisiana. Superficially considered, it would seem that there is something to be said for this position. But, upon more thorough consideration of the cases, it is made evident that the basis for the ruling is one of title and the adjudications recognizing the title in the vendor in accordance with the laws of the state in which the contract was entered into do not conflict with, but, on the contrary, are conformable to the laws of Louisiana. Article 10 of our Revised Civil Code provides:

"The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed.

"But the effect of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect.

"The exception made in the second paragraph of this article does not hold, when a citizen of another State of the Union, or a citizen or subject of a foreign State or country, disposes by will or testament, or by any other act causa mortis made out of this State, of his movable property situated in this State, if at the time of making said will or testament, or any other act causa mortis, and at the time of his death, he resides and is domiciliated out of this State."

And Article 2452 of the Revised Civil Code provides that "the sale of a thing belonging to another person is null; it may give rise to damages, when the buyer knew not that the thing belonged to another person."

In the early case of Overland Texarkana Company v. Bickley, supra, the Supreme Court considered a conditional sale contract executed in Arkansas, whereby an automobile was purchased under the characteristic provision that the title to the car should remain in the seller until the payment of the purchase price. The automobile was driven to Louisiana before the price had been paid and was acquired by a dealer in Zwolle. The Arkansas vendor, under the "condi-

tional sale" contract, claimed the ownership of the automobile and the court held that one who has no title to an automobile can convey none to his vendee, saying [152 La. 622, 94 So. 139]:

"When this stranger brought the automobile into this state he had no title to it; and he acquired none thereafter. Not having any, he could convey none."

And in Equitable Credit Company v. Miller, 8 La.App. 254, Judge Jones, speaking for this court, said:

"Under conditional sale of an automobile made in Florida, purchaser, who had no title when he brought the car into Louisiana, could convey none.

"The sale having been made in Florida the laws of that state must control."

But, in Finance Securities Company v. Mexic, 188 So. 657, Judge Janvier, as the organ of this court, said:

"Where conditional sale contract is made in the state where the property is then situated, but it is contemplated that property is to be used in another state, laws of the latter state and not of state where the property was originally situated govern in determining validity and construction of contract, irrespective of where property is delivered."

█ A contract must be interpreted according to the lex loci contractus "but the status of the res is governed by the lex loci situs. If the lex loci situs requires a certain formality of acknowledgment and registry, the omission is not cured by attestation and registration of the lex loci contractus". Weber Showcase & Fixture Company v. Waugh, D.C., 42 F.2d 515, 519. In the cited case certain fixtures belonging to a bankrupt were sold by the receiver in bankruptcy. The showcases had been the subject of a conditional sale. The Court held that though the contract was executed in California and "must be construed according to the California law" that the Washington law governed in determining the effect of the conditional sale as a claim against the showcases which were installed in storehouses operated by the bankrupt in the State of Washington. The Washington law required that "all conditional sales of personal property * * * where the property is placed in the possession of the vendee, shall be absolute as to all bona fide purchasers * * * and subsequent creditors * * * unless within ten days after the taking of possession by the vendee, a memorandum of such sale * * * shall be filed in the auditor's office of the county, wherein, at the date of the vendee's taking possession of the property, the vendee resides". Section 3790, Rem.Comp.Stat. Wash. The court said:

"The fixtures being shipped by the plaintiff to the Pilcher Company, vendee, at Aberdeen, Tacoma, Everett, and Monroe [all in the State of Washington], and installed in the several stores of the vendee, under the plaintiff's supervision, the conditional sales contracts were void as to subsequent creditors of the vendee. First National Bank v. Wilcox, 72 Wash. 473, 130 P. 756, 131 P. 203. See, also, Casey-Hedges Company v. Wilcox, 72 Wash. 605, 131 P. 205; Burroughs Adding Machine Co. v. Wilcox, 72 Wash. 700, 131 P. 206; National Bread Wrapping Machine Company v. Crowl, 137 Wash. 621, 243 P. 840.

"The receiver, appointed at the suit of general creditors, succeeded to the rights of the subsequent creditors as well as the stockholders of the corporation, and free of unrecorded conditional sales contracts. Bayne et al. v. Brewer Pottery Company et al. (C.C.) 90 F. 754. See, also, Corbett v. Riddle (C.C.A.) 209 F. 811; Cincinnati Equipment Company v. Degnan, (C.C.A.) 184 F. 834, certiorari denied, 220 U.S. 623, 31 S.Ct. 724, 55 L.Ed. 614."

As we have said, the chattel mortgage act was first introduced in Louisiana in 1912, No. 65, cautiously and with limited application at first, when only lumber, logs and live stock could be mortgaged, but thereafter, by a series of amendments—Act No. 155 of 1914, Act No. 18 of the Extra Session of 1915, Act No. 151 of 1916, Act No. 198 of 1918, Act No. 81 of 1922, Act No. 232 of 1924, Act No. 189 of 1932, and Act No. 178 of 1936, the scope of the law was constantly broadened, so that it now includes every form of chattel, and other restrictions upon its use and validity removed. Since the introduction of the chattel mortgage in this state, there has been few cases which may be said to be in point so far as the present discussion is concerned. See the interesting article in 10 Tulane Law Review, page 275.

Under the present chattel mortgage law, as amended by Act No. 178 of 1936, the mortgage need only be recorded in the place where it is executed and at the domicile of the mortgagor. Before this amendment was adopted, it was essential that the mortgage be recorded in every parish of

the state in which the property subject to the mortgage might be or become situated; in other words, "a chattel mortgage only affects property while such property is situated within the parish in which the mortgage has been recorded", Wilson v. Lowrie, 156 La. 1062, 101 So. 549, 550, and, where automobile subject to recorded chattel mortgage is removed to another parish without mortgagee's consent and is there sold under attachment to innocent purchaser, the latter acquires good title, the mortgage not having been recorded in the latter parish. Gulf Finance & Securities Co. v. Taylor, 160 La. 945, 107 So. 705.

It is true that the law has been changed since these cases were decided, but they are analogous in principle. If we assimilate the sixty-four parishes of Louisiana to the forty-eight states of the Union, we will observe that, according to the holding in the cited cases, our courts would not recognize, let us say, the principle of comity as between the several parishes of the State. For example, a chattel mortgage in all respects valid and enforcible in the Parish of Orleans would have no effect as against third persons in the adjoining Parish of Jefferson unless recorded there.

Section 2 of the Louisiana Chattel Mortgage Act reads in part as follows:

"Every such mortgage of property mentioned in Section 1 shall be in writing, setting out a full description of such property to be mortgaged, so that the same may be identified, and also stating definitely the time when the obligation shall mature. In order to affect third persons without notice, both within the Parish where recorded and outside of the Parish where recorded, but within the State of Louisiana, said instrument must be passed by notarial act * * *".

And Section 4 reads in part as follows:

"Every such mortgage shall be a lien on the property mortgaged from the time same is filed for recordation, which filing shall be notice to all parties in the State of the existence of such mortgage, and said lien shall be superior in rank to any privilege or lien arising subsequently thereto".

Section 2256 of the Revised Statutes of 1919 of the State of Missouri, Mo. St.Ann. § 3097, p. 1919, provides among other things that when the instrument of mortgage has been recorded according to its terms that it "shall thenceforth be no-

tice of the contents thereof to all the world". The Louisiana Statute on the subject, as will be seen from a perusal of the quoted section, confines the effect of recordation under it to the State of Louisiana. We believe the Missouri Statute covers too much territory, but neither this provision nor the more modest one in the Louisiana Statute can have any extra territorial effect. If a chattel mortgage executed in compliance with the laws of Louisiana, properly recorded in this State but unrecorded in Missouri, is to have any effect as against the interest of third persons, and conversely with respect to a Missouri chattel mortgage and its effect in Louisiana, the recognition must depend upon the principles of the law of comity and not because of the language of the statute with respect to the effect of recordation. We have said that there is a difference between the conditional sales contract and the chattel mortgage so far as the principle under discussion here is concerned. See work of Joseph H. Beale, "The Conflict of Laws", Volume 2, page 999. There is also an important difference between the common law mortgage and the civil law mortgage, a difference which was the subject of comment by Judge Porter of the Second Circuit in the case of E. J. Brock, Jr. v. Cupples, on rehearing, decided in 1916, No. 931 of the docket of that Court (unreported). In that case, which is practically on all fours with the instant case, E. J. Brock, Jr., the plaintiff, a resident of Fort Worth, Texas, sold an automobile to a man by the name of Evans for $1300, of which $150 was paid in cash and the remainder represented by notes secured by a mortgage on the automobile. A few days after the sale, the car was removed to Shreveport, Louisiana, without the knowledge or consent of plaintiff, where it was sold to one E. J. Cupples, and seized in his hands under a writ of sequestration sued out by Brock. The plaintiff relied upon the Texas mortgage, which was admittedly in due form and properly recorded according to the laws of the State of Texas, but not registered in Louisiana, just as the plaintiff in this case relies upon the validity of the Missouri mortgage also conceded to be valid according to the laws of Missouri, but not registered in this State. In the original opinion the Court, speaking through Judge Thompson, held that the Texas mortgage was valid in Louisiana without recordation. Judge Porter dissented. A rehear-

ing was granted and in an opinion by Judge Porter with Judge Thompson dissenting, it was held that the mortgage could not be recognized in Louisiana without recordation. A writ of review was applied for to the Supreme Court and refused. We quote the following from the very able opinion of Judge Porter:

"As the act in question has never been interpreted by our Supreme Court, the safest guide to a correct interpretation of it is, I think, the jurisprudence relating to mortgages on unmovable property, and to the registry laws in general.

"I do not think the laws or jurisprudence of our sister states will be of much assistance, because the common law chattel mortgage is essentially different from the fundamental idea of all Louisiana mortgages, in this: that it confers upon the mortgagee at least a qualified ownership in the property.

"It is defined as a 'conveyance of personal property to secure the debt of the mortgagor, which being conditional at the time, becomes absolute if at a fixed period the property is not redeemed.' Am and Eng Ency of Law Vol 5 page 947.

"It vests the title to the property in the mortgagee subject to be defeated upon the performance of the conditions expressed. Ib. It confers, in the absence of contrary provisions, a right to the immediate possession of the property. Ib. page 985.

"The very instrument which is the basis of this suit, declares that the automobile is owned by the plaintiff, the mortgagee and that the title is in him until the mortgage shall be discharged. Now, under our law, both by its general policy, and its express provisions, the mortgage confers no title to or in the property, but only a privilege upon it.

"And this difference may well account for the prevalent common law rule that the mortgage is not defeated, by the illegal removal of the property to another county or state, and its alienation by the mortgagor.

"If we should once admit that under our law the plaintiff could be deemed the owner of the property—that is to say, give effect to the literal meaning of the mortgage here involved, then the case would be at an end, because the transfer of the property by one not the owner of it, or the representative of the owner, confers no title upon the purchaser.

"This rule has some exceptions which it is not necessary to enumerate, but with these exceptions, it is common to all the jurisdictions in this country."

In Devant v. Pecou, 13 La.App. 594, 128 So. 700, our Brethren of the First Circuit, declined to recognize a Texas chattel mortgage, unrecorded in this State, to the prejudice of a seizing creditor in Louisiana.

■ After many years of resistance the Legislature of this State finally adopted the chattel mortgage, but it did not adopt the common law form of mortgage. The essentials of the common law mortgage is the intention to transfer title to secure the payment of a debt or the performance of an obligation. "The mortgage operates as a sale of the subject matter on condition subsequent, passing a present legal title subject to be defeated by the performance of the condition". Corpus Juris Secundum, Volume 14, Verbo Chattel Mortgages, § 1, page 575. In the civil law there is no alienation of the mortgaged property which is merely given as security.

To be consistent with the cases interpreting conditional sales contracts, it would be necessary to recognize the mortgagee in an unrecorded common law mortgage if, according to the laws of the State where the mortgage contract was entered into, he might be considered to be the owner of the property. In the case before us the plaintiff makes no pretension as owner of the automobile. Whether it might have asserted a claim to ownership is doubtful for we read in Corpus Juris, Volume 41, page 279, Verbo "Mortgages", "In a majority of the States of the Union, partly by force of statute and partly by the decisions of the Courts, the common-law doctrine of mortgages has been abrogated, and has given place to a purely equitable theory according to which a mortgage is nothing more than a mere lien or security for a debt, passing no title or estate to the mortgagee and giving him no right or claim to the possession of the property."

Article 3342 of the Revised Civil Code provides:—

"Methods of acquiring mortgages—Recordation—Necessity for.—Conventional mortgage is acquired only by consent of the parties, and judicial and legal mortgages only by the effect of a judgment or by operation of law.

"But these mortgages are only allowed to prejudice third persons when they have

been publicly inscribed on records kept for that purpose and in the manner hereafter directed."

The Louisiana Chattel Mortgage Act provides "in order to affect third persons without notice, both within the Parish where recorded and outside of the Parish where recorded, but within the State of Louisiana, said instrument [Act of mortgage] * * * or a certified copy thereof shall be recorded in the office of the Recorder of Mortgages * * *".

■ Our conclusion is that the Missouri chattel mortgage, not recorded here, cannot be given effect in this State to the prejudice of innocent parties in this State acquiring title to, or a lien upon the chattel subject to the mortgage, consequently, and

For the reasons assigned it is ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed, that the writ of sequestration be dissolved and it is now ordered that there be judgment dismissing plaintiff's suit at its cost.

Reversed.

JANVIER, Judge (dissenting).

The question presented is simply this: Is a chattel mortgage on an automobile executed in the State of Missouri and there recorded in full compliance with Missouri law enforcible in Louisiana as against an innocent third party, notwithstanding the chattel mortgage has not been recorded in Louisiana.

It must be conceded that, in an overwhelming majority of American jurisdictions, it is well settled that "the interest of the mortgagee is not divested by any dealings with the chattel in the second state whether such dealings consist of a sale by the mortgagor to a purchaser for value and without notice, or of an attachment or execution levied by a creditor of the mortgagor. It is immaterial that the mortgage has not been recorded in the second state". Restatement of the Law—Conflict of Laws, § 268, page 354.

In Corpus Juris Secundum, Vol. 14, Chattel Mortgages, § 15, it is said that:

"By weight of authority a mortgage, if valid and properly executed and recorded according to the law of the state where the mortgage is executed and the property at the time is located, will be held valid even as against bona fide creditors and purchasers in another state to which the property is removed by the mortgagor, unless it contravenes the statute or settled law or policy of the forum."

I must concede, however, that it is generally agreed that Louisiana is among the very small minority—with Michigan, Pennsylvania and Texas—in which the contrary doctrine is established. But I do not find as a fact that that minority view has been expressed here since the enactment of Act No. 178 of 1936, which statute gives the impression of an intended change in public policy. Of course I realize that the Act of 1936 has no application to the case at bar, for it is concerned only with the effect of chattel mortgages executed in Louisiana. But it evidences a definite change in public policy toward the effect of a chattel mortgage in a jurisdiction other than that in which it is recorded, because, whereas formerly such a mortgage was effective only where recorded, by that statute it was made effective against third persons anywhere within the State of Louisiana if recorded in the parish in which it was executed and in the parish of the domicile of the mortgagor. The act declares that, in order to affect third persons without notice, both in the parish where recorded and outside the parish where recorded, but within the State of Louisiana, the mortgage shall be recorded in the office of the recorder of mortgages in the parish in which the act of mortgage is executed and also in the parish in which the mortgagor is domiciled. Thus, by this act, the legislature has declared a policy in favor of the recognition of chattel mortgages without the necessity of recordation in the place to which the chattel is removed.

It is true that there is a declaration in this statute limiting its effect to persons within the State of Louisiana, but that declaration merely evidences a realization that such an enactment cannot have statutory effect except within the state, and that each state in which such a Louisiana mortgage may be presented for enforcement must necessarily have the right to determine whether its own public policy shall prevent the enforcement of such a mortgage. If the Missouri mortgage with which we are concerned cannot be made effective here as against third persons unless recorded, then under what law can it be made effective even if recorded. The very statute which

I have just discussed provides that the chattel mortgage shall have effect in other parishes only if recorded where executed, and also if recorded at the domicile of the mortgagor. Since the mortgagor in such case is never domiciled in the state in which it is sought to enforce the mortgage, there could never be in this state a recordation which would comply with the requirements of that particular act.

Two cases are cited as authority for the view that Louisiana is definitely with the minority on the question under consideration.

The first of these is Brock v. Cupples (on rehearing), decided in 1916 by the Court of Appeal for the Second Circuit (No. 931 of their docket, unreported), before the enactment of the Act of 1936, and in which the Supreme Court refused a writ. A study of the record in that case will show that there were technical reasons for which that writ might have been refused. At that time the Supreme Court was not required to state reasons for the refusal of such writs, and it is obvious that the applicant for the writ omitted many documents required by law and later furnished them with a substantial apology for their original omission. In fact, opposition to the granting of the writ was filed and in it attention was called to these irregularities and omissions. The writ may have been refused on that ground. At any rate, however, at that time the Louisiana public policy definitely required a recordation in each jurisdiction in which it might be sought to enforce the mortgage.

The other case, which is frequently pointed to, is Devant v. Pecou, 13 La.App. 594, 128 So. 700, but that case also was decided long before the enactment of the statute of 1936.

I am concerned with the effect of the establishment in Louisiana of the minority doctrine. Let it not be believed that I am concerned with the possible effect on investment corporations which may lend money on such mortgages. It is quite true that such a minority doctrine will seriously discourage such corporations from the lending of money in such minority jurisdictions. But the real effect will be felt by those persons who desire to make use of the facilities furnished by such lending corporations. It is well known that an overwhelming majority of automobiles, radios, washing machines, and such other similar modern conveniences and necessities, are purchased with funds resulting from the execution of chattel mortgages, and, if such funds are to be curtailed as the result of the definite establishment of this minority doctrine, it is the people of the state who will ultimately feel the effects. If we are to make use of chattel mortgages in Louisiana, there should be a realization that chattel mortgage laws should be classed among those statutes which should be uniformly interpreted all over the United States.

Since I believe that there is in our jurisprudence at this time no case which definitely requires the establishment of this doctrine and since I see, in Act No. 178 of 1936, a declaration of a change in public policy, I respectfully dissent.